

NR:PP/FTB                                            *271 Cadman Plaza East*
F. #2018V02939                                       *Brooklyn, New York 11201*


May 15, 2020


By ECF


The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. William F. Boyland, Jr.
        Criminal Docket No. 11-850 (SJ)

Dear Judge Johnson:

        The government respectfully submits this letter in opposition to William F.
Boyland, Jr.'s motions for compassionate release.  (ECF Nos. 183 and 184.)  Boyland is
currently serving a 14-year sentence following his 2014 trial convictions for various criminal
schemes relating to his position as a member of the New York State Assembly.  Construing
Boyland's pro se motions in a light most favorable to him, Boyland requests release or
modification of his sentence to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i),
because of the COVID-19 pandemic and because of his claim that his wife's disability leaves
her unable financially to support their son.  For the reasons set forth below, the motion
should be denied.

        I.      Background

        Boyland was an elected member of the New York State Assembly
representing the 55th Assembly District, which covers the Ocean Hill, Brownsville, Bedford-
Stuyvesant, Crown Heights and Bushwick sections of Brooklyn, New York.  At trial, the
government demonstrated that Boyland perpetrated four criminal schemes over multiple
years: (1) the Real Estate Scheme (Counts One through Fifteen); (2) the Carnival Scheme
(Counts Sixteen through Nineteen); (3) the Fraudulent Voucher Scheme (Count Twenty);
and (4) the Non-Profit Scheme (Count Twenty-One).  In brief, the government demonstrated
the following at trial:

        The Carnival Scheme:  From August 2010 to August 2011, Boyland, together
with others, including his chief of staff, extorted and accepted over $14,000 in bribes in

exchange for undertaking official action to benefit a cooperating witness posing as a carnival promoter and an undercover FBI special agent posing as an out-of-town businessman ("UC-1").

The Real Estate Scheme:  From November 2010 to August 2011, Boyland attempted to extort $250,000 and accepted $7,000 in cash bribes for undertaking official action to benefit UC-1 and another undercover FBI agent ("UC-2"), who also purported to be an out-of-town businessman pursuing real estate ventures in the Assembly district.  In exchange for the bribe, Boyland offered to use the influence of his office to aid UC-1 and UC-2 in their real estate ventures in his district.  Specifically, on March 25, 2011, UC-1 met with the defendant and paid him $7,000 in cash, on behalf of himself and UC-2, in exchange for obtaining New York State grant monies to help finance real estate development projects in the defendant's district.[1]

On April 29, 2011, during a meeting in a hotel room in Atlantic City, Boyland proposed a scheme in which UC-1 and UC-2 would purchase a former hospital in the Assembly district for $8 million, obtain state grant money to renovate the hospital, and resell it for $15 million to a non-profit organization that the defendant said he controlled.  Boyland assured the undercover FBI agents that he would use his influence as an Assemblyman to secure state grant money for the project and handle any zoning issues that arose.  In exchange, as a quid pro quo, Boyland demanded $250,000 in bribes from the agents.  This meeting was captured on audio recording.

The Fraudulent Voucher Scheme:  From January 2007 to December 2011, Boyland stole New York State funds by submitting over 200 false New York State Assembly Member Travel Vouchers ("Vouchers").  Boyland falsely claimed to be in Albany on legislative business when he in fact was not in Albany, including days when the defendant was in fact in North Carolina, Virginia and even Istanbul, Turkey, for personal matters, as well as days when the defendant was in fact in New York City meeting with the undercover FBI agents from whom he conspired to extort $250,000.  In reliance on the false Vouchers, New York State paid Boyland $71,339.66 in fraudulent mileage expense and per diem payments.

The Non Profit Scheme:  From July 2007 to September 2010, Boyland successfully conspired to defraud New York State and the New York State Office of the Aging.  Boyland used his position as an Assemblyman to steer New York State funds ("State Funds") to Wayside Outreach Development.  Boyland then directed that some of those State Funds be used for himself and his political campaigns by paying for community events that promoted him, such as a boat cruise for senior citizens in his district.  In addition, Boyland directed that the State Funds be used to pay for goods that promoted the defendant, such as "Team Boyland" t-shirts, which were distributed at some of those community events.

---

[1] This $7,000 was also payment in part for the "Carnival Scheme" discussed above.

On March 6, 2014, a jury found Boyland guilty of all twenty-one counts in the Third Superseding Indictment. Judge Townes remanded Boyland into custody. On September 17, 2015, Judge Townes sentenced Boyland to a total of 168 months' imprisonment, and three years' supervised release, and ordered him to pay a $2,100 special assessment, $155,610.14 in restitution, and $169,410.14 in forfeiture. (ECF Nos. 124 & 125.) On July 10, 2017, the Second Circuit affirmed Boyland's convictions. United States v. Boyland, 862 F.3d 279 (2d Cir. 2017).

The defendant now seeks to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).[2]

II.     Applicable Law

"A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority. United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) (citation and internal quotation marks omitted). The statute upon which the defendant relies, 18 U.S.C. § 3582(c)(1)(A)(i), which is often referred to as the "compassionate release" statute, is one such authority. Section 3582(c)(1)(A)(i) permits a Court to modify an already imposed sentence if, "after considering the factors set forth in [18 U.S.C. § 3553(a)] to the extent they are applicable," the court finds "extraordinary and compelling reasons" justify the modification. See 18 U.S.C. § 3582(c)(1)(A);

Prior to the enactment of the First Step Act of 2018, such a modification required a motion by the Bureau of Prisons (the "BOP"). United States v. Zullo, 09-CR-64 (GWC), 2019 WL 7562406, at *1 (D. Vt. Sept. 23, 2019). The First Step Act altered that requirement to permit defendants to file motions pursuant to this section. However, Section 3582(c)(1)(A) requires that a defendant first request that the BOP make a motion for compassionate release and can only bring a motion him or herself if the BOP does not act within 30 days or BOP denies the motion and the defendant exhausts the available administrative remedies. 18 U.S.C. § 3582(c)(1)(A).

Assuming a defendant has exhausted the remedies, the Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to Section 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13 (Policy Statement); see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner. See, e.g., United States v. Traynor, 04-CR-0582

_____

[2] On April 23, 2020, the Warden of Schuylkill FCI denied Boyland's April 20, 2020, compassionate release request. On May 5, 2020, Boyland appealed his denial through the Administrative Remedy Program, but the appeal was rejected.

(NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the district court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (quoting Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist"). In addition, "even if a prisoner qualifies for such reduction because of his medical condition . . . [,] whether to reduce a sentence is a matter that rests in the discretion of the court." Gotti, 2020 WL 497987, at *6.

Even if a court finds extraordinary and compelling reasons exist, the court is "still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." United States v. Lisi, No. 15 CR. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (citation and internal quotation marks omitted).

III.     Boyland's Motion for Compassionate Release Should be Denied

Boyland engaged in four separate criminal schemes while an elected representative of the people of Brooklyn, and his conviction has been affirmed on appeal. At this point, he has served just half of his 168-month sentence and is currently incarcerated at a facility with no confirmed cases of inmates or staff with COVID-19. He does not warrant release under Section 3582.[3]

Boyland's motions do not demonstrate that he falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release. 18 U.S.C. § 3582(c)(1)(A). Boyland writes that COVID-19 "creates a unique, extraordinary and potential irreversible life threatening circumstance based on petitioner's medical conditions." (ECF No. 184 at 1.) Boyland lists numerous medical conditions that warrant his release: pre-diabetes, sleep apnea, obesity, high cholesterol, and an enlarged prostate. Boyland also alleges that he passed out on a previous occasion and was not treated by BOP.

_____

[3] The Bureau of Prisons currently estimates that, with good time credit, Boyland will be released in February 2026.

As an initial matter, the government's review of Boyland's medical records does not support his claims of suffering from sleep apnea, and it appears that his cholesterol is well-managed with his current medication. In any event, Boyland makes no showing that these conditions put him at higher risk of severe illness from COVID-19. See People Who Are at Higher Risk for Severe Illness, Center for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.[4] Although the government appreciates the danger that COVID-19 poses to all individuals, Boyland has not demonstrated he is "suffering from a serious physical or medical condition," "that substantially diminishes [his] ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, Application Note 1(A). See, e.g., United States v. Miller, 16-CR-570 (ARR), May 8, 2020 Order at 5 (high cholesterol being controlled by medication not a high risk for severe illness from COVID-19 and does not present compelling reason for compassionate release); United States v. Gileno, No. 19-CR-161 (VAB), 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (defendant, who allegedly suffered from high blood pressure, high cholesterol, asthma, and allergies, "has not shown that his medical issues, which remain largely the same as when he was sentenced, 'substantially diminish [his] ability . . . to provide self-care' within the correctional facility" (brackets in original)).

Further, the risk of potential exposure to COVID-19 in a BOP facility – standing alone – cannot form the basis to release a sentenced prisoner. See United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."). The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan.[5] In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and

---

[4] Boyland writes that "anyone with type-2 diabetes and respiratory issues is at the top of the list for contracting as well as being vulnerable to the COVID-19 virus." (ECF No. 184 at 5.) However, Boyland does not suffer from diabetes, a condition distinct from pre-diabetes, and the government cannot confirm that Boyland suffers from any respiratory issues. In addition, although Boyland states that he has obesity, the CDC states that only individuals with "severe obesity," i.e. a body mass index of 40 or higher, are at higher risk for severe illness. Based on the government's review of Boyland's medical records, Boyland does not have a body mass index greater than 40.

[5] See BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp

safety of inmates and BOP personnel.[6]  As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission."  Id.  In addition, the BOP has implemented "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President.  BOP's planning is structured using the Incident Command System (ICS) framework."  Id.

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff."  Id.   These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty."  Id.  For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities."  Id.  In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to enhanced screening and inmates being subject to screening managed by its infectious disease management programs.  Id.  As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols."  Id.

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event.[7]

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted

_____

[6] See BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp

[7] See BOP Update on COVID-19, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf

inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.[8]

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. Id. All new inmates are screened, and those with any risk factors, even if asymptomatic, are quarantined.[9]

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement."[10] In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." Id.

The government has confirmed that, as of March 14, 2020, Boyland is currently incarcerated at a facility with no confirmed cases of COVID-19 among inmates or staff. Accordingly, and for the reasons set forth above, Boyland has not met the high burden in demonstrating that he should be released due to COVID-19.

Boyland also writes that he should be released because his wife is disabled and she is currently caring for their son. (ECF No. 183 at 3.) However, Boyland does not provide any additional information or supporting documentation to support this request, such

---

[8] See BOP COVID-19 Action Plan: Phase Five, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[9] See BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp; BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[10] See Update on COVID-19 and Home Confinement, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

as his son's age and financial circumstances (beyond saying that he is a teenager), any recent change in his family circumstances, or whether any other family members can care for his son. Thus, there is no evidence that Boyland is the only available caregiver for his son. Further, the fact that the defendant can no longer be the primary income-earner for his family, as he was prior to his incarceration, is unfortunately the "common collateral damage of imprisonment" when a parent commits a serious offense. United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (holding that district court abused its discretion in granting downward departure based on family circumstances that were not "exceptional"). An inability to provide financial support is simply not an exceptional circumstance warranting compassionate release.

Because Boyland has not met his burden to show that there are "extraordinary and compelling reasons" that might permit his release at this time, the Court need not proceed to the analysis under Section 3553(a) as to whether release is indeed warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13. However, if a Section 3553(a) analysis was conducted, it would weigh strongly against Boyland's release.

Boyland engaged in multiple criminal schemes which spanned many years. He blatantly solicited over $250,000 in bribes and stole money that was directed to the elderly residents of his community. Boyland represented some of the poorest and most disadvantaged residents in New York City. He took advantage of those residents and inflicted tremendous damage on his community by placing his own financial interests above theirs. The evidence at trial also demonstrated the defendant's greed and sense of entitlement when he submitted over 200 false vouchers to New York State.

Boyland flagrantly and unabashedly committed crimes while on pre-trial release in both the Southern District of New York and this Court. In fact, Boyland committed the majority of the crimes of conviction while on pre-trial release in the Southern District. As noted above, Boyland even submitted fraudulent per diem vouchers to New York State that falsely stated he was in Albany on official business, when, in fact, he was meeting with the undercover FBI agents in New York City, and was appearing in court in the Southern District on his criminal case there. See March 25, 2014 Tr. at 3-4; PSR ¶ 40.

As a result of Boyland's conduct, Judge Townes imposed a sentence of 14 years' imprisonment – the longest prison term given to a convicted former state officeholder in New York in recent years. Judges Townes found that Boyland "clearly had no respect for the law," and repeatedly described Boyland's continuing to commit crimes while on pre-trial release as "egregious." Sept. 17, 2015 Tr. at 17, 20. Despite this, Boyland continues to refuse to accept any responsibility for his crimes. In sum, even if this Court were to consider Boyland's compassionate release motion, there is simply no basis to modify the sentence Judge Townes imposed for Boyland's serious, repeated, and "egregious" conduct.

IV.    Conclusion

        For the reasons set forth above, the government respectfully requests that the Court deny Boyland's motions.

                                     Respectfully submitted,

                                     RICHARD P. DONOGHUE
                                     United States Attorney

                    By:    /s/ Philip Pilmar
                                       Philip Pilmar
                                       F. Turner Buford
                                     Assistant U.S. Attorneys
                                     (718) 254-6106/6483

cc:    Clerk of Court (SJ) (By ECF)
       William F. Boyland, Jr. (By first class mail)